IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PHILLIP MORRIS LEWIS,
gdc id # 510782, Case No.
236089

       Petitioner,

                        CIVIL ACTION NO.

v.                      1:07-cv-2803-JEC-WEJ

Tony Howerton[1], Warden,

                        PRISONER HABEAS CORPUS
       Respondent.               28 U.S.C. § 2254

**ORDER AND OPINION**

I. **INTRODUCTION**

    Petitioner Phillip Morris Lewis has filed a habeas corpus petition, pursuant to 28 U.S.C § 2254, challenging his February 2003 state court conviction for rape and aggravated sodomy, for which he was sentenced to two life sentences without parole. The case is before the Court on the State's motion to dismiss [32] the petition on timeliness grounds.

----

    [1] Mr. Howerton assumed the position of Warden of Phillips State Prison on July 1, 2010.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a state prisoner to file a habeas petition within one year of the date his state conviction becomes final. *See* 28 U.S.C. § 2244(d)(1)(A).[2] A state conviction become final at either the conclusion of the direct appeal process or the expiration of the time to seek direct review. *Id.* The statute, however, provides that, in calculating this one-year limitation period, one should not count the time "during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). In addition, caselaw has held that the time period may also be tolled for equitable reasons. *See Holland v. Florida,* 130 S. Ct. 2549, 2560-62 (2010).

The State argues that petitioner Lewis filed his habeas petition over one year after the finality of his state conviction. Lewis disagrees that his petition was untimely. His main contention, however, is that, even if his petition were not timely filed, any period of time exceeding the one-year limit

_____

[2] § 2244(d)(1)(B)-(D) sets out three other triggers for the start of the one-year limitation period, but none of them apply here.

should be equitably tolled as a result of his mental illness.

The Court directed the magistrate judge to conduct an evidentiary hearing. The latter did so and thereafter issued a Report and Recommendation [59] recommending that the State's motion to dismiss be denied. Through his appointed counsel, Lewis filed Objections [60]. Consistent with 28 U.S.C. § 636(b)(1) and Rule 72 of the Federal Rules of Civil Procedure, the Court has conducted a careful, *de novo* review of the portions of the Report and Recommendation to which the parties have objected. The Court has reviewed the remainder of the Report and Recommendation for plain error, and finds none. *See United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983).

The Court has extensively studied this case and, after thorough and careful consideration of the facts, the briefing, the evidentiary hearing, and the legal issues, the Court concludes that the State's Motion to Dismiss should be granted. Because this case has had such a long and complicated history, the Court sets that background out first, before explaining why it believes dismissal is warranted.

## II. **PROCEDURAL BACKGROUND**

### A. **STATE PROCEEDINGS AND CALCULATION OF LIMITATIONS PERIOD**

Petitioner Phillip Morris Lewis was convicted by a Murray County jury in February 2003 for rape, aggravated sodomy, aggravated assault, criminal trespass and four lesser associated crimes. The crimes were committed on March 17, 2002. *Lewis v. State*, 271 Ga. App. 744, 745 (2005). On March 5, 2003, the superior court sentenced him to concurrent sentences totaling 20 years. (1st Am. Pet. [25] at §§ 2-4.) Concluding that the above sentence was unlawful, as it violated the mandatory sentence that should have been imposed for the rape and aggravated sodomy counts, given Lewis's requisite number of predicate convictions, the State moved to modify the sentence to a sentence of life without parole. (*Id.*) After a hearing, the trial court granted the motion and, on March 26, 2003, imposed concurrent life sentences on Lewis. (*Id.*)

Through his trial counsel, Lewis appealed his conviction, arguing that the evidence was insufficient to prove him guilty of the crimes. That contention was rejected by the Georgia Court of Appeals, which affirmed his conviction on February 22,

4

2005. *Lewis*, 271 Ga. App. at 744, 745.

Lewis sought neither certiorari to the Georgia Supreme Court nor certiorari with the United States Supreme Court. Accordingly, his conviction became final 10 days after affirmance by the Georgia Court of Appeals, on March 4, 2005, when the time to seek certiorari to the Georgia Supreme Court expired.

The AEDPA 365-day statute of limitations period ran untolled for <u>93 days</u>, from March 5, 2005 until June 6, 2005, when Lewis delivered his state habeas petition to prison officials to be mailed.[3] The superior court conducted a hearing

---

[3] As the Court noted in its Order of April 5, 2010 [42] at n.1-2, the "June 6 date is now in doubt" following the Georgia Supreme Court's ruling in *Roberts v. Cooper*, 286 Ga. 657 (2010), that the "mailbox rule" only applies to <u>appeals</u> of denials of habeas corpus petitions, <u>not to the filing of such petitions</u> in the trial court. As to the latter, the date of filing is deemed to be the date the petition was received by the Clerk of Court. *Id*. at 659-61.

While Lewis tendered his petition to prison officials on June 6, it was actually only filed by the Clerk on June 16, 2005. If June 16, 2005 were to become the operative date for the filing of the state habeas petition, and any resulting tolling, Lewis will have lost 10 more days of statutory tolling, as 103 days, not 93 days, would have then expired prior to the filing of his state habeas petition. As explained below, the Court has assumed that June 6, not June 16, is the date on which tolling began and hence that only 93 days expired before Lewis

on petitioner's habeas claim and denied that petition on April 19, 2006.

Lewis appealed this dismissal to the Georgia Supreme Court, which, believing that the notice of appeal in the state habeas court had not been filed until May 26, 2006, instead of by the deadline of May 19, 2006, dismissed the appeal as untimely on November 6, 2006.[4] Although the State disagrees that the statute of limitations should be tolled for any of the time the appeal was pending in the Georgia Supreme Court, as the basis for the latter's dismissal was its untimeliness, this Court has assumed that the entire period between the filing of the state habeas petition and its dismissal by the Georgia Supreme Court would be tolled. If this Court's calculation is accurate, then only 93 days had expired at the time of the dismissal of the state habeas petition.

---

filed his state habeas petition.

[4]  The magistrate judge's second Report and Recommendation [36] contains an excellent discussion of the confusion by court personnel that attended petitioner's filing of his appeal of the state habeas denial in the state superior court and of the related certificate of probable cause in the Georgia Supreme Court.  Likewise, the magistrate judge analyzes thoroughly the legal ramifications of the state court's decision.  (*Id.* at 8-17.)

The statute of limitations clearly began running again on November 7, 2006, after the Georgia Supreme Court's dismissal, and ran untolled for 351 days, until Lewis finally filed his federal habeas petition in this Court on October 23, 2007. In short, even giving Lewis the benefit of the two calculation disputes between the parties,[5] 444 days of untolled time passed after Lewis's conviction became final, which is 79 days outside the one-year (365-day) statute of limitations set by 28 U.S.C. § 2244(d)(1).[6] In short, absent equitable tolling, Lewis's federal petition was untimely.

**B.    FIRST REPORT AND RECOMMENDATION [10] AND COURT RULING [14]**

After Lewis filed his federal habeas petition in this

----

[5]    That is, (1) the date that the state habeas petition should be deemed to have been filed (June 6 or June 16, 2005) and (2) whether the entire period of time that the appeal of the denial of that petition was before the Georgia Supreme Court should be tolled or instead whether only the 30-day period for filing that appeal is excluded.

[6]    The Magistrate's initial calculation of Lewis's untimeliness was 79 days, but that calculation somehow changed to 90 days in the third and final Final Report and Recommendation. (2d R&R [36] at 26 n.3 versus Final R&R [59] at 4 n.2.) In any event, Lewis's petition was either 79 days or 90 days beyond the statute of limitations, and to proceed, he must receive equitable tolling for the equivalent period of time.

Court, the magistrate judge, on November 29, 2007 [3], directed the State to show cause within 30 days why the writ should not be granted. The State responded with both an Answer [4] and a Motion to Dismiss [5].

It appears that Lewis did not receive a copy of the State's motion to dismiss or Answer, as he filed two pleadings with the magistrate judge inquiring why the State had not complied with the show cause order. Specifically, on February 15, 2008, he filed a Motion to Appoint Counsel [8], as well as a letter inquiring as to whether the State had ever responded to the show cause order [8-1]. Having received no response to that inquiry, a couple of months later, Lewis filed a Notice of Status of Case [9] that was more assertive in its tone. Inquiring again why the State had not responded to the show cause order, Lewis stated that he had waited for four months to receive the State's response and had heard nothing from the Court, the Warden, or the State. He requested that the magistrate judge "'please' find out what's going on and why." (*Id.*)

Shortly thereafter, the magistrate judge issued his first Report and Recommendation [10] recommending dismissal of the petition on timeliness grounds. Finding that 625 days had

expired since Lewis's conviction was final, which was 260 days over the 365-day limitations period, the magistrate judge concluded that Lewis's petition was untimely.[7]

The magistrate judge then proceeded to consider whether there was any equitable tolling period available to render Lewis's petition timely. Referring to documentation that Lewis had submitted in support of his federal petition,[8] the magistrate judge noted that Lewis had included a letter written by his prison psychiatrist indicating that, since March 2006, Lewis had been on several psychiatric medications at different times, including "Seroquel, Thorazine, Valproic Acid, Benadryl, Wellbutrin, Remeron, and Vistaril whose, '[p]otential side effects...include, but are not limited to: disorientation (to time, person and place), confusion, sedation, dizziness,

_____

[7] The magistrate judge reached this calculation by deeming the state habeas petition to have been filed 10 days later than the undersigned has found and by excluding all of the time that the appeal of the denial of the state habeas petition was before the Georgia Supreme Court, except for the 30-day period of time for filing that petition.

[8] Lewis filed no objections, but, given Lewis's obvious interest in the litigation, as reflected in his two letters to the magistrate judge, the Court concludes that this was an honest omission and that Lewis had not received a copy of the State's motion to dismiss.

headaches, restlessness, hallucinations, [and] delusions...."
(1st R&R [10] at 6.) The magistrate judge further noted that the
doctor stated that he expressed "no opinion as to whether this
list of possible side effects affected [Petitioner's]
interactions with the legal system." (*Id.*)

Acknowledging that equitable tolling is an extraordinary
remedy and that the petitioner has the burden of establishing
his entitlement to it, the magistrate judge referred to caselaw
holding that the existence of a mental condition, by itself,
does not justify equitable tolling. Rather, the petitioner must
establish a causal connection between that condition and his
inability to file a timely petition. (*Id.* at 7.) On this
record, the magistrate judge found that Lewis had not shown that
his mental condition was the cause of his failure to file a
timely petition. (*Id.*) Accordingly, the magistrate judge
recommended that Lewis's federal habeas petition be dismissed.

One week later, Lewis requested an extension of time to
file his objections, stating that he needed more time to obtain
an affidavit from his psychiatrist, Dr. Schneider, who would
testify that Lewis "is and was" unstable and had been admitted
to prison units for unstable inmates who were denied access to

paper, pens, or law materials. (Mot. for Extension [11] at 1-2.)
This motion noted that Lewis had been "in and out of these units
due to psychotic episodes and self-mutilation by razors" and
that this evidence was critical in showing that Lewis's failure
to meet the deadline was due to exceptional circumstances: that
is, he "was deemed unstable and was not allowed law materials."
(*Id.* at 2.)  The motion was accompanied by an affidavit by Lewis
affirming the above and indicating that he was seeking medical
records showing the time frames for his admission to the ACU
(acute care unit) and CSU (crisis stabilization unit).  ([11-
1].)  The undersigned granted this extension [12].

    Lewis filed his objections [13].  The objections were
brief, but indicated that Lewis had been as diligent as he could
be, under the circumstances, and that his mental restrictions
had hampered his ability to concentrate and stay focused and had
also resulted in his being placed in CSU and ACU, which had
further compromised his ability to represent himself.  (*Id.* at
2-3.) Lewis further requested reconsideration of the magistrate
judge's denial of his motion for appointment of counsel and
submitted a new letter from his psychiatrist, Dr. Schneider.
(*Id.* at 3-4.)

In this letter, Dr. Schneider noted that he had reconsidered his previous opinion regarding the effect of Lewis's mental illness on his ability to meet filing deadline for his habeas petition, which deadline the doctor believed to be April 29, 2006.  Dr. Schneider indicated that Lewis had been in the mental health stabilization units multiple times during this period, including during March 30-May 15, 2006.  He noted that Lewis suffered from various mental disorders, with the first condition listed being "bipolar disorder."  The doctor described the numerous symptoms manifested by Lewis, including confusion, inability to focus, manic symptoms, racing thoughts, and others.  He believed that these symptoms most likely interfered with Lewis's ability to interact with the legal system. Finally, he acknowledged that, in addition to his prescribed medications, Lewis had been using illicit drugs in prison "very frequently and at times, severely," and that while it is unclear to what extent Lewis's drug use had affected his mental state, Dr. Schneider believed that he definitely had a severe mental illness separate from this drug use.  (*Id.* at 4.)

The undersigned issued an Order rejecting Lewis's argument that he had demonstrated a mental impairment sufficient to

excuse his tardy filing. (Order of Sept. 23, 2008 [14].) The
Court noted that Dr. Schneider had been focused on the wrong
time period in stating his opinion that Lewis had been
substantially impaired. Other facts also in the record made the
Court hesitant to conclude that equitable tolling was
appropriate. Specifically, the Court noted that Lewis had been
able to file a timely certificate of probable cause application[9]
with the Georgia Supreme Court, just ten days after his release
from disciplinary lock-down. Further, his voluntary and
apparently extensive illegal drug use may have contributed to
any mental impairment, and this drug use was not an unavoidable
circumstance. (*Id*. at 9-10.)

As Lewis had already enjoyed two opportunities to marshal
his evidence and had not done so convincingly, the Court

_____

[9] As explained by the magistrate judge, to appeal the
denial of a state habeas corpus petition, a prisoner must file,
within 30 days of the denial, a notice of appeal in the superior
court and a certificate of probable cause (CPC) in the Georgia
Supreme Court. (2d R&R of Jan. 21, 2012 [36] at 11-13.) Thus,
an appeal of a state habeas ruling by a prisoner requires two
separate steps, in two separate state courts, to initiate that
process.

Notwithstanding the two labels placed on the two documents
whose filings are necessary to initiate an appeal, the Court
sometimes collectively refers to both pleadings as an appeal,
unless it is important to make a distinction.

declined to further delay a ruling denying the motion to dismiss. Nonetheless, Lewis's submission had created some concerns for the undersigned that there could be merit to his request for equitable tolling. Accordingly, the undersigned offered Lewis one additional opportunity to demonstrate that his mental impairment, during the period of May 19, 2006 until October 23, 2007 had caused any tardy filings. The Court invited a motion for reconsideration that would focus on Lewis's condition during that time period, as well as a record of the dates in which Lewis was confined in mental stabilization units. (*Id.* at 11.)

In this Order, the Court also adjusted the magistrate judge's calculation of expired time in the case, in a way that benefitted Lewis. That is, the magistrate judge had found that Lewis's state habeas petition was filed on June 16, 2005, which was the date the Clerk stamped the petition filed. Since the magistrate judge's Report and Recommendation, however, the Eleventh Circuit had ruled that the filing of a state habeas petition in Georgia is governed by the "mailbox rule," meaning that such a petition is deemed to be filed when it is delivered to prison officials for mailing. (*Id.* at 6-7)(citing *Taylor v.*

*Williams,* 528 F.3d 847 (11th Cir. 2008). Accordingly, because Lewis's state habeas petition was delivered to prison officials on June 6, the undersigned determined that the latter date, not June 16, should be deemed as the filing date. This recalculation bought Lewis another 10 days of tolled time.[10] (*Id*. at 6-7.)

---

[10] To add more confusion to the determination of the statutorily tolled period here, after issuance of the above Eleventh Circuit opinion in *Taylor* and after issuance of the above-described Order by the undersigned, the Georgia Supreme Court issued an opinion disavowing the Eleventh Circuit's holding in *Taylor* and instead ruling that, while the <u>appeal</u> of the denial of a state habeas petition is subject to the mailbox rule, the <u>initial filing of that petition</u> in the state superior court is not. That is, a petition is deemed to be filed the date it is stamped filed, not the date it is mailed. *See Roberts,* 286 Ga. at 660 n.3.

As discussed *infra*, notwithstanding this subsequent ruling by the Georgia Supreme Court, this Court would not count these 10 days against Lewis, either (1) because it is not clear that the Georgia Supreme Court's ruling in *Roberts* had been previously "firmly established and regularly followed," *Siebert v. Campbell*, 334 F.3d 1018, 1025 (11th Cir. 2003), or (2) because if the Eleventh Circuit, itself, was confused about the applicability of the mailbox rule to the filing of a state habeas petition, an uneducated prisoner should not be held to a higher standard, and the time should therefore be equitably tolled.

This Court's reliance on *Siebert* may be shaky, however, as its continued viability is in question following the United States Supreme Court's reversal of part of the Eleventh Circuit's decision in that case. *See Allen v. Siebert*, 552 U.S. 3, 7 (2007).

In addition, the Georgia Supreme Court had determined that Lewis's appeal of the denial of his state habeas petition was untimely, because his notice of appeal, that was due to be filed in the state habeas superior court by May 19, 2006 (30 days after denial of the petition), had not been stamped as filed until May 26, 2006. Relying on that state court determination, the magistrate judge had determined that, except for the 30-day window for Lewis to file a CPC application, the remaining time during which the appeal was pending before the Georgia Supreme Court could not be tolled, as the petition had ultimately been deemed to be untimely.

In this same September 23, 2008 Order [14], the undersigned noted that the above finding of untimeliness by the Georgia Supreme Court arguably violated the latter's own mailbox rule for appeals of habeas petitions, as its receipt by the court on May 26 would mean that Lewis had necessarily submitted the petition to be mailed before that date. (*Id.* at 7 n.2)(citing *Messaline v. Williams*, 274 Ga. 552 (2001)). Yet, whether Lewis had tendered the petition by May 19, which was the end of the 30-day deadline for filing an appeal and a certificate of probable cause, was not clear, as all the documents associated

with that appeal were not a part of the record.  (*Id.*)

Accordingly, the Court invited Lewis, in his motion for reconsideration, to present evidence that he had submitted his CPC application and appeal to prison authorities on or before March 19, 2006.  (*Id.* at 11.)  The Court advised, however, that even if the appeal to the Georgia Supreme Court could be deemed timely, contrary to the latter's ruling, that would buy Lewis only 171 additional days of tolling, and he would still need to demonstrate his entitlement to equitable tolling for an approximately 80 more days.  (*Id.* 7 n.2.)

**C.  PETITIONER'S MOTION FOR RECONSIDERATION, COURT'S ORDER GRANTING SAME AND APPOINTING COUNSEL, AND FILING OF AMENDED COMPLAINT AND SUPPLEMENTAL PLEADING URGING TIMELINESS OF FEDERAL HABEAS PETITION**

Petitioner Lewis timely filed his Motion For Reconsideration [15].  While the motion did not yet convince the Court that Lewis was entitled to equitable tolling, the undersigned concluded that, given all the facts, Lewis's proffer was sufficient to warrant further development of his claim.  The Court therefore granted his motion for reconsideration, denied without prejudice the State's motion to dismiss, and directed the magistrate judge to appoint counsel for plaintiff.  (Order

of Dec. 17, 2008 [17] at 4-5.)

The magistrate judge appointed Gerald King of the Federal Defender Program as counsel for Lewis [18]. Counsel filed an unopposed motion to amend the habeas petition, which was granted, and a First Amended Petition [25] was thereafter filed. Counsel also filed a Supplemental Response [26], in response to this Court's direction to petitioner to further develop the record concerning equitable tolling and concerning the timeliness of Lewis's filing of his appeal of the denial of the state habeas petition.

In this Supplemental Response [26], petitioner, through his counsel, honed in on the question whether Lewis had timely filed an appeal and certificate of probable cause, following the denial of his state habeas petition by the superior court. Providing records from those state courts, counsel convincingly demonstrated, both to the magistrate judge and to the undersigned, that Lewis had submitted a CPC application and appeal to prison officials prior to the May 19 deadline. (*Id.* at 4-8; *see also* 2d R&R [36] at 8-17.) It was only through what appears to have been a serious of mistaken assumptions by state court personnel that the latter ultimately determined, in

violation of their own mailbox rule, that Lewis's appeal was untimely.

Counsel also offered a couple of other arguments in favor of additional statutory tolling. First, he argued that because Lewis was resentenced on June 28, 2006 in order to correct a clerical error in the judgment, the sentence was not final until 30 days after that date. (*Id.* at 9-11.) As explained in later orders, that argument does not provide petitioner any additional statutory toling, because, as he filed no subsequent appeals or habeas petitions thereafter, the conviction would have become final on July 28, 2006 and his federal habeas petition would have been due by July 27, 2007. Again, the present petition was filed in October 2007.

Second, counsel argued that, although Lewis never filed a certiorari petition with the United States Supreme Court, he should have gotten the benefit of the 90-day period for filing that petition, following the affirmance of his conviction by the Georgia Court of Appeals on February 22, 2005, for purposes of determining when his conviction became final, with this "final" date triggering the start of the one-year limitations period. (2d R&R [36] at 12-17.)

As petitioner's federal habeas petition was only 79 days late, a delay of 90 days for the start date of the one-year limitations period would render Lewis's federal habeas petition timely, without any need to consider whether equitable tolling was appropriate. Unfortunately for petitioner, however, he never filed a petition for certiorari with the United States Supreme Court--and would have been unable to seek certiorari there--and cannot use the 90-day window for filing such a petition to extend the start of his limitation period.

The above conclusions mean that equitable tolling must occur for the petition to be timely. Counsel for Lewis argued in his Supplemental Response [26] that such tolling should occur based on petitioner's mental condition. (*Id.* at 18-28.) Counsel notes that a report from Dr. Schneider, among other things, indicates that Lewis was committed to the institution's mental health units on six separate occasions, for a total of 32 days, during the relevant time period of May 26, 2006-October 23, 2007.[11] (*Id.* at 24-25.) While these 32 days would not

---

[11] In his report, Dr. Schneider also noted that Lewis had spent 55 days during this period in disciplinary lock-down, without acess to legal materials, and 9 days in the Murray County Jail for his resentencing. (*Id.* at 25 and n.5.)

equal the 79-day period of equitable tolling that Lewis requires, counsel argued that, overall, this mental illness should be adequate to toll whatever time was necessary. (*Id.* at 18-28.)

Counsel also argued that equitable tolling should occur because petitioner has a viable claim that he was actually innocent of the crime and, "with the benefit of discovery and further factual development of his claims...he can make the threshold showing of innocence." (*Id.* at 30.)

### D.   <u>STATE'S RENEWED MOTION TO DISMISS [32] AND MAGISTRATE JUDGE'S SECOND REPORT AND RECOMMENDATION [36]</u>

The State renewed its motion to dismiss the petition as being untimely [32]. Following further briefing [33,34], the magistrate judge issued his second Report and Recommendation [36], again recommending that the State's motion to dismiss be granted.

Addressing first the question whether the period of time from May 19, 2006 (the deadline for filing an appeal to the Georgia Supreme Court from the denial of habeas petition) to November 6, 2006 (the date that the Georgia Supreme Court dismissed the appeal on timeliness grounds, the magistrate judge

did a thorough analysis of this confusing factual and legal issue. He concluded that the Georgia Supreme Court had failed to follow its own mailbox rule, in deeming the appeal not to have been timely filed, and therefore did not conform to its own firmly established and regularly followed practice. (2d R&R [36] at 16.) Therefore, the entire time that the appeal was pending in the Georgia Supreme Court--that is, from May 19, 2006 until November 6, 2006--should have been tolled.[12]

_____

[12] Both this Court and the magistrate judge have cited the Eleventh Circuit's decision in *Siebert v. Campbell*, 334 F.3d 1018, 1025 (11th Cir. 2003) in support of our decisions not to count as expired the almost 6-month time period during which Lewis's state habeas appeal was pending in the Georgia Supreme Court. We did this, even though the Georgia Supreme Court dismissed the appeal as untimely (which should mean that the time it was pending was not tolled), because in our review of the record, we concluded that the certificate of probable cause was timely filed under Georgia law.

As noted earlier, any continuing reliance on the Eleventh Circuit's decision in *Siebert* is iffy, given the United States Supreme Court's reversal of that decision in *Allen v. Siebert*, 552 U.S. 3, 7 (2007). Eleventh Circuit decisions have been unclear as to the extent to which the Eleventh Circuit *Siebert* decision is still good law. *Compare Price v. Sec'y Dep't of Corr.*, No. 11-11932, 2012 WL 3871352, at *2 (11th Cir. Sept. 7, 2012)(noting that the previous Eleventh Circuit *Siebert* holding requiring that dismissal of a petition by a state court must be based on a procedural rule that is "firmly established and regularly followed" was reversed by the Supreme Court's holding in the same case that "[w]hen a postconviction petition is untimely under state law, that is the end of the matter for purposes of § 2244(d)(2)" and *Walton v. Sec'y, Fla. Dep't of*

22

As noted, petitioner had also argued that the second resentencing of petitioner, on June 28, 2006, to correct a clerical error, restarted the date when the conviction became final, rendering June 28, 2006 as that date. The magistrate judge rejected this argument, concluding that, under Georgia law, a mere technical correction in a defendant's sentence does not restart the statutory time for filing a notice of appeal. In short, this resentencing had no impact on the calculations here under AEDPA. (*Id.* at 17-21.)

---

*Corr.*, 661 F.3d 1308, 1311 (11th Cir. 2011)(the same) *with Delguidice v. Fla. Dep't of Corr.*, 351 Fed. App'x 425, 427 (11th Cir. 2009)(citing Eleventh Circuit *Siebert* decision for the proposition that federal court gives "due deference" to state procedural rules governing whether an application for habeas relief is "properly filed" only when those rules are "firmly established and regularly followed") and *Van Zant v. Fla. Parole Comm'n*, 308 Fed. App'x 332, 335 (11th Cir. 2009)(reversing a district court's refusal to toll time based on an untimely pleading in the state court because the rule that rendered the pleading untimely was not firmly established or regularly followed, as required by the Eleventh Circuit decision in *Siebert*.)

This Court's tolling of this 6-month period and the earlier 10-day period when the petition was filed, over the objection of the State, is not the pivotal decision in determining whether Lewis's federal habeas petition was timely, as he is still 79 days over the one year limit, even giving him the benefit of the above tolling. For that reason, this Court does not have to firmly, or even regularly, determine how viable *Siebert* still is.

As noted, petitioner never filed a certiorari petition with the United State Supreme Court. As to whether the plaintiff could nevertheless delay the start date for his limitations period, based on this 90-day period of time theoretically available to him to file such a petition in the United States Supreme Court, the magistrate judge said no. The magistrate judge reasoned that because petitioner did not take his direct appeal to the highest court in the state, the Georgia Supreme Court, he would have been unable to seek certiorari and therefore could not take advantage of a hypothetical 90-day window for filing a cert petition that would have never actually been open to him. (*Id.* at 21-26.) With this final calculation, the magistrate judge concluded that the 365-day period for filing a federal habeas petition expired on August 5, 2007, meaning that petitioner's October 23, 2007 filing of that petition was 79 days late.

Given that determination, the magistrate judge addressed petitioner's argument that, because of his mental illness, sufficient time should be equitably tolled to render his federal habeas timely filed. The magistrate judge rejected this argument, concluding that petitioner had made an insufficient

showing that his mental illness caused him to miss the filing deadline. (*Id.* at 26-41.) Likewise, the magistrate judge concluded that petitioner could not rely on the actual innocence exception to the time bar, as he had not presented new reliable evidence of his innocence, even though his appointed counsel had had over a year to find such evidence. (*Id.* at 41-42.)

Both petitioner and the State filed objections to this second R&R. The State objected to the magistrate judge's recalculation of the time period, and particularly his determination that time could be statutorily tolled while the appeal of the state habeas denial to the Georgia Supreme Court was pending, because the latter had dismissed the appeal as untimely. This Court rejected those objections and adopted the magistrate judge's recommendation on these points. (Order of Apr. 5, 2010 [42] at 4-8.)[13]

Petitioner also objected to the magistrate judge's calculation of the number of expired days prior to the filing of the federal habeas petition, arguing again that his conviction did not become final until the 90-day period for

---

[13] (*See* discussion *supra* at 22 n.12.)

filing certiorari in the United States Supreme Court expired. He also argued that he was entitled to equitable tolling as a result of his second resentencing and the confusion that this may have caused. Finally, petitioner most vociferously disputed the magistrate judge's conclusion that his mental illness did not entitle him to equitable tolling. (*Id.* at 9-10.) Petitioner requested an evidentiary hearing.

As to this latter objection concerning petitioner's mental illness, this Court concluded that to better resolve this hotly-disputed question, an evidentiary hearing should be held. Further, this Court held in abeyance the other two objections cited above. (*Id.* at 16-18.)

### E. __EVIDENTIARY HEARING AND MAGISTRATE JUDGE'S THIRD REPORT AND RECOMMENDATION [42]__

Thereafter, the magistrate judge conducted an evidentiary hearing [54]. Dr. Schneider, petitioner's prison psychiatrist, testified, and counsel presented affidavits from some of petitioner's fellow inmates who had helped him prepare legal pleadings. Over the objection of petitioner's counsel, the State called petitioner to testify. Petitioner's counsel had objected on the ground that petitioner was not competent to

testify and supported this objection with the testimony of a psychologist who opined that petitioner had substantial auditory memory deficiencies and that testifying would likely upset him greatly.

The magistrate judge subsequently issued his third Final Report and Recommendation [59], again recommending that Lewis's federal habeas petition be dismissed as untimely. Petitioner has filed Objections [60] which are now before the Court for resolution.

**III.     RESOLUTION OF PETITIONER'S OBJECTIONS TO MAGISTRATE JUDGE'S THIRD REPORT AND RECOMMENDATION CONCERNING DETERMINATION OF DATE WHEN CONVICTION BECAME FINAL**

In the Report and Recommendation now pending before the Court, the magistrate judge recommended that the State's motion to dismiss on timeliness grounds be granted. In this section, the Court addresses petitioner's objections to the magistrate judge's recommendations concerning AEDPA calculations <u>not</u> directly related to petitioner's arguments concerning equitable tolling to account for his mental illness.

**A.     90-DAY PERIOD FOR SEEKING CERTIORARI IN UNITED STATES SUPREME COURT, FOLLOWING AFFIRMANCE OF CONVICTION BY GEORGIA COURT OF APPEALS**

Petitioner had earlier contended that the magistrate judge had incorrectly concluded that his conviction had become final prior to the time when it in fact was final. Were the petitioner correct in this assertion, this would mean that 80 days would be subtracted from the amount of time that had earlier been deemed to have expired prior to the filing of the federal petition.[14] As this Court has earlier concluded that Lewis's petition was filed 79 days late, an effective crediting of this 80-day period would mean that the petition was not untimely.[15] That is, there would be no need to look to equitable

---

[14] At first glance, it seems curious why petitioner would receive an additional 80 days of non-expired or tolled time, instead of 90 days, should he be allowed to delay the start date of his limitations period by the 90 days permitted for filing a United States Supreme Court cert petition. The answer is that, for purposes of fixing the date on which his conviction became final, 10 days had already been tacked onto the date of the Georgia Court of Appeals' decision, which 10 days is the time period that petitioner had to file a petition for certiorari with the Georgia Supreme Court. Accordingly, had petitioner prevailed on his argument that he should be credited with the 90-day federal certiorari period, 80 less days of time would have expired (90 days for federal cert petition minus 10 days already credited for time to petition Georgia Supreme Court).

[15] The magistrate judge and this Court have often referred to this particular issue in terms of whether Lewis is entitled to 90 days of statutory tolling. In truth, the issue is not one of tolling, but of identifying the date when the judgment of conviction became final.

tolling.

To recap, the Georgia Court of Appeals upheld petitioner's conviction on February 22, 2005. The magistrate judge concluded that the limitations period began on March 4, 2005, which represents the 10 days that petitioner had after the Georgia Court of Appeals upheld his conviction to seek review with the Georgia Supreme Court. As noted, Lewis never sought review in the Georgia Supreme Court. Likewise, he never filed a petition for certiorari in the United States Supreme Court.

Nevertheless, as a state court litigant has 90 days to file a petition for certiorari with the United States Supreme Court, following an adverse decision by the highest court of the state, petitioner argues that, for purposes of pegging when the conviction became final, he is entitled to have this additional 90-day period tacked onto the date that the Georgia Court of Appeals issued its order affirming the conviction.[16]

---

[16] The Georgia Court of Appeals affirmed Lewis's conviction on February 22, 2005. If his judgment of conviction did not become final until 90 days later, on May 23, 2005, then only fourteen days of untolled time would have passed before Lewis filed his state habeas petition on June 6, 2005. The filing of his state habeas petition tolled the limitations period until November 6, 2006, when the Georgia Supreme Court dismissed his habeas petition. The statute of limitations then ran untolled

The magistrate judge rejected this argument because a state litigant can petition for certiorari to the United States Supreme Court only after first seeking review from the highest court in the state. As petitioner never sought certiorari from the Georgia Supreme Court on his direct appeal, and ceased all litigation of that appeal at the Georgia Court of Appeals level, a certiorari petition to the United States Supreme Court was never a possibility for him and, accordingly, he was not entitled to an additional 90-day period for purposes of calculating the final date of his conviction.

This Court had reserved ruling on this issue until the final Report and Recommendation had been submitted. The Court now rules, and agrees with the magistrate judge. As stated before, the one-year statute of limitations for the filing of a federal habeas petition begins to run from the "date on which the judgment became final by the conclusion of direct review <u>or the expiration of the time for seeking such review</u>." 28 U.S.C. § 2244(d)(1)(A) (emphasis added). Petitioner relies on the

_____

for 351 days, until Lewis filed his federal habeas petition on October 23, 2007. Thus, if Lewis's judgment of conviction did not become final until May 23, 2005, the statute would have run untolled <u>exactly 365 days</u> when he filed his petition on October 23, 2007.

underlined part of the statute in arguing that "the expiration of the time for seeking review" was the 90-day period that he was allowed to petition for certiorari to the United States Supreme Court.

The United States Supreme Court has recently rejected such an argument. In *Gonzalez v. Thaler*, 132 S. Ct. 641 (2012), a Texas prisoner appealed his murder conviction to that state's intermediate appellate court, which affirmed the conviction. The defendant then allowed his 30 days to seek discretionary review with Texas' highest appellate court, the Texas Court of Criminal Appeals, to expire. *Id.* at 646. In other words, he did not seek discretionary review by his state's highest court in pursuing his direct appeal. The prisoner did not certiorari before the United States Supreme Court.

Later, the prisoner filed a federal habeas petition, which was dismissed as untimely by the district court, whose judgment was affirmed by the Fifth Circuit. The Supreme Court granted certiorari on two issues: one of which is pivotal here. Before the Supreme Court, the defendant argued, among other things, that his one-year limitations period to file a federal habeas petition under AEDPA should begin only when his time for seeking

certiorari with the United States Supreme Court in the direct appeal process had expired. Stated another way, he argued that his conviction was not final until the time for seeking United States Supreme Court review had expired. *Id*. at 656.

The Supreme Court disagreed. It noted that it can review "only judgments of a 'state court of last resort' or of a lower state court if the 'state court of last resort' has denied discretionary review." *Id.* As a result, for "a state prisoner who does not seek review in [the] State's highest court, the judgment becomes 'final' under § 2244(d)(1)(A) when the time for seeking such review expires." *Id.*

The above holding reflects the facts before this Court. Petitioner did not seek discretionary review by the Georgia Supreme Court of the affirmance of his state conviction by the Georgia Court of Appeals. Likewise, he did not seek certiorari in the United States Supreme Court. Applying the holding in *Gonzalez* to this case, petitioner's conviction became final when his time for seeking discretionary review in the Georgia Supreme Court expired, which was 10 days after the affirmance of his conviction by the Georgia Court of Appeals. This is the same calculation that the magistrate judge has consistently made in

this case and the undersigned has assumed to be accurate in making its own calculations. In short, as correctly determined by the magistrate judge, petitioner's conviction became final on March 4, 2005.

Nor was the Supreme Court's decision in *Gonzalez* a surprise to Georgia habeas litigants. In *Pugh v. Smith*, 465 F.3d 1295 (11th Cir. 2006), the defendant had not sought discretionary relief from affirmance of his criminal conviction in either the Georgia Supreme Court or the United States Supreme Court. Yet, he nonetheless sought to have the 90-day period of time permitted to file a certiorari petition in the United States Supreme Court tacked onto the date of the affirmance of his conviction by the Georgia Court of Appeals, such that his conviction would not be deemed final until 90 days after the date of that latter event.

The Eleventh Circuit confirmed that in order to be able to file a petition for certiorari in the United States Supreme Court, a prisoner must first obtain a judgment from "the highest court of a State in which a decision could be had," as required by 28 U.S.C. § 1257(a). *Id.* at 1299. *Pugh* held that the court of last resort in Georgia for finality purposes is its supreme

court. *Id.* at 1300. Accordingly, *Pugh* held, the conviction of *Pugh* was final on the date that the time for discretionary review in the Georgia Supreme Court expired, which was 10 days after the Georgia Court of Appeals' affirmance of his conviction. *Id.*

Lewis's situation is exactly like that of *Pugh* and the result is the same in both cases. Moreover, the *Pugh* decision was issued on September 29, 2006. At that time, his appeal/certificate of probable cause was pending before the Georgia Supreme Court, with the latter dismissing the appeal on November 7, 2006. As Lewis's time to file his federal habeas petition expired on July 27, 2007, he, or the prisoner helping him with his appeal, had ample time to regroup and pivot from any mistaken belief that he could utilize the 90-day period for filing a certiorari petition to the Supreme Court to calculate the time in which a federal habeas petition was due. In short, the Court concludes that the magistrate judge's calculations as to this matter are correct.

**B.    SIGNIFICANCE OF LEWIS'S SECOND RESENTENCING TO CORRECT A CLERICAL ERROR**

Also left undecided from the round of briefing leading to

the magistrate judge's Second Report and Recommendation is the question whether Lewis's second resentencing on June 28, 2006 lengthens in any way the time by which he had to file his federal habeas petition.

During Lewis's state habeas hearing, the State identified a clerical error in Lewis's judgment form, which sentenced Lewis to life imprisonment without parole for the aggravated sodomy charge under O.C.G.A. § 17-10-6.1. (State Habeas Trans. [7-12] at 7-8; Sentencing Form [7-6] at 18.) This statutory citation was incorrect as Lewis was actually sentenced under O.C.G.A. § 17-10-7. (State Habeas Trans. [7-12] at 7-9; 2d Sent. Hr'g Tr. [7-13].)[17] The state habeas court ordered a remand to correct

---

[17] Lewis appeared before the Superior Court of Murray County three times with respect to his sentence. On March 5, 2003, after his jury trial and conviction, the judge orally sentenced Lewis to 20 years for the rape and aggravated sodomy charges, respectively. (1st Sent. Hr'g Tr. [7-12] at 7-8.) His remaining convictions bore sentences less than 20 years that were to run concurrently. (*Id.* at 8-9.)

The state filed a motion to modify sentence, which was heard before the Trial Judge on March 26, 2003. (2d Sent. Hr'g Tr. [7-13].) Lewis was then sentenced to life imprisonment without parole for the rape and aggravated sodomy charges.

On remand from the state habeas court, Lewis's second re-sentencing occurred on June 28, 2006. (Court Production Order [27-1].) The sentence remained unchanged; only the statute cited for the conviction was changed.

the "clerical error," which corrective sentencing proceeding took place on June 28, 2006. (Court Production Order [27-1]; Final Disposition of Superior Court [27-2].)

Lewis argues that this second re-sentencing is relevant to his request for equitable tolling because "the state habeas court's remand to correct his sentence might lead a *pro se* petitioner with mental illnesses as severe as [his] to conclude that he had one year from the date of his remand to file his federal habeas petition--a contention the magistrate court did not address in its report and recommendation." (Order of Apr. 5, 2010 [42] at 17.) This Court suggested that the magistrate judge should consider this argument before issuing the final Report and Recommendation now before the undersigned. (*Id.* at 17.)

The magistrate judge did so and rejected petitioner's argument. He noted that Lewis has never alleged that he actually drew the conclusion that the second resentencing "reset" the federal habeas limitations period. (3d R&R [59] at 3-4 n.1.) Without some evidence of that reliance, one cannot

impute a misunderstanding to the petitioner. Accordingly, this is not then a case where there is evidence that a petitioner was misled by a court about a significant event affecting federal habeas deadlines. *See Knight v. Schofield*, 292 F.3d 709 (11th Cir. 2002)(granting equitable tolling where Clerk of the Georgia Supreme Court sent notice of denial of CPC to wrong person and petitioner only learned of denial after inquiry); *Spottsville v. Terry*, 476 F.3d 1241, 1245-46 (11th Cir. 2007)(affording equitable tolling to petitioner who sent application for CPC to wrong court because Georgia Superior Court gave incorrect filing instructions).

The magistrate judge also concluded that even if the second resentencing reset the statute of limitations for Lewis, his petition was still untimely as he filed his federal habeas petition over a year after the second resentencing, With no appeal of or state habeas action directed toward this second resentencing, Lewis would have no statutory tolling available to extend this one-year period.

The Court agrees with this conclusion, with one correction to a date that the magistrate judge used. The magistrate judge explained in relevant part that: "The Murray County Superior

Court entered an amended sentence [26-6] on June 28, 2006. Even if a new limitations period began on that date, Petitioner still would need equitable tolling for the period from on or about June 28, 2007, through the filing of his federal habeas petition on October 23, 2007." (3d R&R [59] at 3 n.1.)

The magistrate judge misspoke in stating that June 28, 2006 would be the date on which the conviction would become final under this alternative argument by petitioner. That is, were June 28, 2006 the operative date for finality of the conviction, petitioner would have received thirty additional days to file a direct appeal to the Georgia Court of Appeals expired.[18] *See* O.C.G.A. § 5-6-38(a)("A notice of appeal shall be filed within 30 days after entry of the appealable decision or judgment complained of;").

Thus, if the second resentencing were deemed to resets the AEDPA statute of limitations, the conviction would be final on July 28, 2006, and petitioner's federal petition would have been due one year after that date. *Ferreira v. Sec'y, Dep't of*

---

[18] Lewis's federal petition has challenged the sentence imposed at the first resentencing hearing, where his sentence was increased from 20 years to life. He has not attacked the second resentencing, which did not alter his life sentence.

*Corr.*, 494 F.3d 1286, 1293 (11th Cir. 2007)("AEDPA's statute of limitations begins to run when the judgment pursuant to which the petitioner is in custody, which is based on both the conviction and the sentence the petitioner is serving, is final.") Petitioner missed that July 2007 deadline by almost three months. Thus, even assuming the second resentencing became the operative date for fixing the finality of the conviction, Lewis still requires equitable tolling.

## IV. <u>EQUITABLE TOLLING</u>

### A. <u>INTRODUCTION</u>

Given the rulings set out above, resolution of the State's motion to dismiss on timeliness grounds now depends on whether Lewis is entitled to equitable tolling for the 79 days by which his federal petition was late. As noted, the magistrate judge, at this Court's direction, conducted an evidentiary hearing on this question. At the hearing, Lewis's counsel called two witnesses: (1) Dr. William Schneider, who was Lewis's treating psychiatrist from the time Lewis was transferred to Phillips State Prison in March 2004 until Schneider left in September 2008; and (2) Dr. Adriana Flores, a psychologist, who testified

solely about her opinion that Lewis was not competent to testify at the evidentiary hearing. Lewis also submitted affidavits of some, but apparently not all, of the prisoners who he says assisted him in litigating his habeas petitions.

The State's only witness was petitioner Lewis,[19] albeit neither the direct examination nor the limited cross-examination by petitioner's counsel covered the area that is pivotal to this litigation: which is, what was Lewis's thinking, or that of anyone assisting him, as to the date by which his federal habeas petition was due. To figure out whether Lewis's mental illness was the cause of his tardy filing, one has to understand how the federal habeas petition happened to be filed when it was. As it is ultimately petitioner's burden to show that his mental illness was the cause of the late filing, that omission is fatal. Particularly is this so when one considers that petitioner has demonstrated the ability to respond promptly to other deadlines. Moreover, since being charged with the

---

[19] Notwithstanding Dr. Flores' opinion that Lewis should not be allowed to testify because of his auditory memory problems and the risk that testifying would greatly agitate him, the magistrate judge permitted the State to call Lewis as a witness. The Court agrees with that decision and Lewis's memory on the stand seemed more than adequate.

offenses for which he was convicted, he has, on some occasions, shown motivation and initiative in his interaction with the legal system.

**B.   <u>STANDARD FOR DETERMINATION OF EQUITABLE TOLLING</u>**

To be entitled to equitable tolling, a petitioner must demonstrate "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland,* 130 S. Ct. at 2562; *Fox v. McNeil*, 373 Fed. App'x 32, 34 (11th Cir. 2010); *Johnson v. Fla. Dep't of Corr.*, 513 F.3d 1328, 1333 (11th Cir. 2008); *Wade v. Battle*, 379 F.3d 1254, 1265 (11th Cir. 2004); *Dodd v. United States*, 365 F.3d 1273, 1282 (11th Cir. 2004); *Helton v. Sec'y for the Dep't of Corr.*, 259 F.3d 1310, 1313 (11th Cir. 2001).

Mental incapacity standing alone, however, is insufficient to justify equitable tolling. *Hunter v. Ferrell*, 587 F.3d 1304, 1308 (11th Cir. 2009). Instead, a "truly extreme case" is required. *Holland v. Florida*, 539 F.3d 1334, 1338 (11th Cir. 2008). Nevertheless, the standard is reasonable diligence, not maximum feasible diligence. *Holland*, 130 S. Ct. at 2565. *See*

*also Myers v. Allen*, 420 Fed. App'x 924, 928 (11th Cir. 2011)(holding that petitioner demonstrated no diligence whatsoever, but noting that abandonment of counsel and cognitive impairments "yield a very low bar for what level of diligence is reasonable").

Whether an inmate sought assistance from an inmate, library personnel, or other source bears on a finding of reasonable diligence. *Bills v. Clark*, 628 F.3d 1092, 1101 (9th Cir. 2010)("The availability of assistance is an important element to a court's diligence analysis."). An inference that a prisoner's mental deficiencies cannot be faulted for an untimely filing can be bolstered by evidence that the prisoner has actually involved himself in the litigation of his own case. *Cf. Hulsey v. Thaler*, 421 Fed. App'x 386, 390 (5th Cir. 2011)(competence shown by request for medical records from state hospital, expressions of concern about access to law library, and performance of work in law library); *McSwain v. Davis*, 287 Fed. App'x 450 (6th Cir. 2008)(noting ability to pursue direct and collateral challenges to conviction in state court as indication that mental illness did not cause failure to file a timely federal habeas petition).

## C.   <u>LEWIS'S FUNCTIONALITY DURING HABEAS LITIGATION</u>

In deciding that Lewis's mental illness was not the cause of his tardiness in filing, the magistrate judge relied on several facts, but was particularly influenced by Lewis's performance at his state habeas evidentiary hearing.[20] Petitioner, through his very able and diligent appointed counsel, disagrees with the magistrate judge's assessment of that performance. Counsel believes that petitioner's performance supports his argument that petitioner's mental illness was the reason for his failure to timely file his federal habeas petition. But petitioner's counsel believes that the most significant evidence in this case is the assessment by Lewis's treating psychiatrist in prison, Dr. Schneider, who concluded that:

> At his best, [Mr. Lewis] was able to carry out only the basic skills of daily living, while he was still almost constantly experiencing one or more of the disabling manifestations of his mental illness, whether it be suicidal ideation, self-mutilation, auditory hallucinations, paranoia, severe depression, an inability to focus or concentrate, or any of the myriad of other symptoms associated with his illness.

---

[20]   The parties are in agreement that Lewis's mental condition has remained relatively unchanged for several years, encompassing the entirety of his post-conviction efforts.

> It is my professional opinion that Mr. Lewis's severe chronic <u>mental illness made him far too symptomatic and unstable to successfully accomplish any complicated task, particularly one as complex as filing a legal brief</u>.

(Schneider's May 6, 2009 Report [26-6] at 5-6)(emphasis added).

The undersigned has carefully reviewed the record in an attempt to arrive at some feel for how petitioner functioned in connection with his efforts to challenge his state conviction, given his mental illness. The following picture emerges.

Prior to his conviction, Phillip Morris Lewis had finished the eleventh grade and obtained a GED. (Evid. Hr'g Tr. [55] at 134.) He was never deemed mentally retarded and is able to read and write at some level. (*Id.* at 135.) At the time he filed his federal habeas petition, Lewis was 37 years old. Despite spending a great deal of his time with mental health officials in the prison, he was able to join the general population of Phillips State Prison on more than one occasion. (*Id.* at 58.) He could also perform tasks such as taking care of his hygiene, following instructions, mowing the lawn, playing sports, writing letters, and filling out forms. (*Id.* at 68, 142-43.)

That said, Lewis is a tortured soul who suffers from a

variety of mental illnesses.[21]  Much of the time in prison he has

manifested extreme anxiety, scattered and disorganized thinking,

and a tendency to fixate and worry a lot.  He frequently

exhibits the mania that is associated with bipolar disorder, in

that he has racing thoughts, quick and pressured speech, and is

impulsive; anger control can be a problem.  (Evid. Hr'g Tr. at

17. ) One of the topics on which he has fixed his anxiety from

time to time is his challenge to the rape conviction for which

he is now serving time.[22]

The most common symptom exhibited by Lewis appears to have

been his frequent threats to commit suicide (which have

obviously never been successful) as well as his frequent threats

---

[21]  Dr. Schneider assessed multiple diagnoses according to
the DSM-IV manual, including "mood disorder not otherwise
specified with possible bipolar and/or major depressive
disorder; psychotic disorder not otherwise specified;
polysubstance dependance; borderline personality disorder; and
antisocial personality disorder."  (Evid. Hr'g Tr. at 17.)
Lewis also exhibited severe symptoms including, hallucinations,
paranoia, disorganized thought process, depression, anger and
impulsivity, and poor sleep.  (*Id.* at 17, 25, 27, 38.)  Dr.
Schneider opined that Lewis "had a very hard time dealing with
even minor stressors," and that he would sometimes cut himself
as a coping mechanism.  (*Id.* at 18, 23-24.)

[22]  (*See* Evid. Hr'g Tr. at 24-25)(reported to mental health
unit and was very upset on the day he found out he would have
to serve a life sentence without parole).  (*See also* discussion
*infra.*)

to cut himself (which often happened) or to hurt others (how much that has actually occurred is unclear, although the record shows that he has been locked down for disciplinary reasons on multiple occasions). Dr. Schneider opines that Lewis can handle very little stress and his cutting of himself is an attempt to cope with the stress or anger that he frequently feels.

Although Dr. Schneider had prescribed every possible medication he could think of to treat Lewis's symptoms, Lewis is the most treatment-resistant patient he had ever dealt with. (*Id.* at 18.) Admittedly, Lewis was not always compliant in terms of taking his medication,[23] and he did use illegal drugs, but the doctor thought that his mental illness would have still been persistent even had he not used drugs and even had he been totally compliant with this medication regimen.

Lewis was a regular visitor to the mental health unit and was often admitted to mental health stabilization units. He often asked to be locked down, which was not typical for most prisoners. (*Id.* at 21-24.) During those times he was in a stabilization unit, he had no access to paper or pens and would

---

[23]   (Evid. Hr'g Tr. at 30)(was compliant 60% of the time; partially compliant 30%, and non-compliant 10% of the time).

have been unable to work on legal matters. (*Id.*)[24]

As to his ability to handle litigation of his habeas petition, Dr. Schneider did not believe that Lewis would be able to write anything as complicated as a legal brief. Lewis would have been able to insert such things as his charges and the dates of his arrest and other pertinent events, but he could not have done anything as difficult as setting out the grounds for his challenge, along with the legal case citations for those grounds. Moreover, he could not have crafted a document that was organized. He would have needed the assistance of another to file a legal brief and that other person would have had to do most of the work for him. (*Id.* at 52, 66-67.)

On cross-examination, Dr. Schneider acknowledged that, during his incarceration, Lewis had been able to write brief letters and fill out forms indicating who could send him packages or call him. He could also write short one-page

---

[24] Although, as the magistrate judge has noted, Lewis was in CSU on October 23, 2007, when he signed his federal habeas petition and when someone tendered that petition for filing. Dr. Schneider indicated that Lewis was admitted that day to CSU and his notes indicate that Lewis stated he was "doing ok; got a DR (disciplinary report) for something didn't do.") (Evid. Hr'g Tr. at 73.)

"rebuttals" or appeals to disciplinary charges that were brought against him. Moreover, these rebuttals appeared to be coherent. In addition, he could calculate whether prison officials had complied with the 30-day deadline to serve him with a disciplinary report and, if not, could state in his rebuttals that the disciplinary report had not been timely served on him. (*Id.* at 68-69, 83.)

Dr. Schneider also indicated that, with regard to legal matters, Lewis "could act in his own best interest" and had "show[n] an interest in pursuing his own legal rights." As the doctor put it, "He knew he had legal problems and was asking for help." In fact, on three separate occasions, Lewis had asked the doctor to write a letter setting out Lewis's mental issues to various courts involved in the habeas process. Finally, Dr. Schneider indicated that Lewis was never catatonic, unresponsive, or unable to interact with others, and the doctor assumed he had a rapport with other inmates. As far as the doctor could tell, Lewis did not have memory problems, although he had never tested him for that. (*Id.* at 83-85.)

As for his rapport with others, the affidavits that Lewis submitted at the evidentiary hearing from inmates who had helped

him with his legal work do suggest that Lewis's genuine manifestation of great distress and anxiety about his legal matters had an effect on these fellow prisoners, who then tried to help Lewis with his litigation.

**D. DETERMINATION WHETHER LEWIS'S MENTAL ILLNESS WAS AN EXTRAORDINARY CIRCUMSTANCE THAT PREVENTED THE TIMELY FILING OF HIS FEDERAL HABEAS PETITION**

As stated above, to obtain equitable tolling of some or all of the limitations period, a petitioner must demonstrate:(1) that he has been pursuing his rights diligently and (2) that some extraordinary circumstance stood in his way and prevented timely filing. *Holland,* 130 S. Ct. at 2562. Leaving aside for the moment the question whether Lewis diligently pursued his rights,[25] the Court turns to the question whether Lewis's mental illness was an extraordinary circumstance that prevented the timely filing of his petition.

---

[25] From a review of this record, the Court concludes that petitioner was diligent at many points during the litigation. The problem is that to ultimately determine whether he was diligent enough, petitioner needed to have explained how he happened to have decided to file his federal petition on the date that he did, as opposed to filing it at least 79 days earlier, when it would have been timely. Without that missing fact, it is impossible to know whether petitioner was ultimately diligent enough to pass the *Holland* test.

The Court credits Dr. Schneider's opinion that Lewis could not have drafted a well-done legal brief on his own behalf, without substantial assistance of others. That would not be a surprising fact even were Lewis not mentally ill, as many pro se prisoner litigants are deficient in this regard and find it necessary to seek the assistance of fellow inmates who have better skills in this area. The issue here, though, is not Lewis's legal writing ability. Instead, the question before the Court is whether the mental illness Lewis suffered was so profound and debilitating that he would have been unable to file a timely habeas petition, given these limitations.

The Court is aware of no precise test articulated in the caselaw for answering the above question. In trying to arrive at a decision, the undersigned has looked at a few factors. First, was the petitioner so impaired mentally that he would have been unaware that there was even a legal process to challenge his conviction? The answer to that question here is obviously, "No." Lewis was clearly aware that there was a post-conviction mechanism to challenge his conviction and indeed he seemed quite motivated to pursue that relief, even if, as Dr. Schneider testified, he may not have been able to craft the best

legal arguments to do so.

Second, would petitioner's mental deficiency have made it impossible for him, with reasonable diligence, to respond timely to deadlines? The answer to that question is also, "No." As will be set out below, Lewis was responsive on many occasions during this litigation and typically was timely in those responses.

Finally, assuming that Lewis did need assistance in handling this litigation, was that assistance available to him? Clearly, Lewis did need and did receive assistance from other inmates.[26] Indeed, even assuming that most or all of the

---

[26] Lewis testified that ever since he has been in prison, other inmates have been very generous in helping him with his legal work. In fact, he cannot recall anyone ever refusing to help him. He thinks that people are so willing to help him because he is a good person. (Evid. Hr'g Tr. at 138-141.) Four inmates who had helped Lewis provided affidavits. (Evid. Hr'g Tr. at Exhs. 13-16.)

Michael Holloway (Exh. 13) indicated that he knew that Lewis wanted to file a state habeas petition, but was concerned that Lewis's mental illness would keep him from presenting his case to the state habeas court. Accordingly, he helped Lewis prepare for the state habeas hearing by writing out things for him to say and by helping him organize his materials.

Marquis West (Exh. 14) affied that he helped Lewis out at the request of one of the staff counselors, who said that Lewis and gotten bad news in the mail about his case "and was freaking

information concerning Lewis's claims that was conveyed to the Court, prior to the appointment of counsel, came directly from those assisting Lewis, these communications were clear and effective enough to prompt the undersigned to launch an extraordinarily lengthy round of litigation that has led to the issuance of three R&Rs by the magistrate judge and multiple orders by the undersigned, the holding of an evidentiary hearing, and the ultimate appointment of counsel.

As noted above, a petitioner cannot free himself from the statutory deadlines that are otherwise applicable to those

---

out." (Apparently, the bad news was the initial R&R recommending dismissal.) Mr. West did not think that Lewis was in his right mind and so he wrote out the motion for an extension to file objections and then wrote the objections for Lewis to copy.

James Heard, Jr., (Exh. 15) prepared the motion for reconsideration that was filed in this Court after the initial dismissal of his petition. He did so by reviewing the case paperwork, speaking with Lewis, and then coming up with the grounds. He helped because Lewis asked him and because Lewis appeared to have no knowledge of the law and seemed to have some mental health problems.

Lucious Johnson (Exh. 16) prepared the state habeas petition, dated June 6, 2005, and the Habeas Corpus Trial Memorandum, dated August 18, 2005. He did so by reading the trial record and came up with the claims and legal arguments, himself; Lewis did not help him write these documents.

filing federal habeas actions merely by virtue of the fact that the petitioner suffers from a mental illness. Rather to receive equitable tolling on this ground, the petitioner must demonstrate that his mental illness was the cause of the tardy filing. Taking the events of this case sequentially and examining Lewis's own role in those events, the Court concludes that Lewis has not made the above showing.

To recap, Lewis's state conviction was final on March 4, 2005 and about three months later, on June 16, 2005, he filed a state habeas petition. A three month period of time to draft and file such a petition does not seem dilatory or suggest a lack of focus. When his state habeas petition was denied by the superior court, Lewis filed an appeal of that decision within thirty days: again, acting in a timely manner.[27]

Finally, after the Georgia Supreme Court's dismissal of his habeas petition on November 6, 2006, Lewis signed and submitted

---

[27] As set out at length earlier in this Order, while the Georgia Supreme Court ultimately determined that this appeal was untimely, it is clear that Lewis timely initiated what he thought, and this Court and magistrate judge also thought, were the appropriate steps. At any rate, the Court has tolled all of the time during which the habeas appeal was pending before the state supreme court.

the present federal habeas petition on October 23, 2007: a period of time that was less than one year after the state court's dismissal, albeit outside the AEDPA limitations period because additional untolled time in the amount of 79 days had occurred at the beginning of the process, during the time between the date on which Lewis's direct appeal concluded and the date on which he filed his state habeas. Yet, even though this federal habeas petition was ultimately deemed untimely, filing it less than a year after dismissal of the state habeas petition was obviously the act of someone who was clearly aware of and attempting to comply with the applicable deadline.

Once he arrived in this Court, petitioner also displayed some solicitude about the process, which solicitude revealed his attention to the proceedings and his awareness of an internal deadline. Specifically, petitioner filed two separate pleadings, in February and April 2008, complaining that the State had not yet answered his petition, even though this Court had set a 30-day deadline for them to do so. Once the magistrate judge had recommended dismissal of the petition, petitioner responded timely and appropriately in requesting an extension of time to file objections to that recommendation.

As to the state habeas hearing, the Court does not disagree with Lewis's counsel that the latter's oral advocacy skills were greatly lacking. Lewis would make some good points, but then not follow through on those points. The manic symptoms of his bipolar disorder also manifested themselves, as he talked very rapidly at some points and as his trial counsel, who was a witness and was the target of the ineffective assistance claim, acknowledged that Lewis appeared to have displayed some mental problems at the hearing.

Yet, as the magistrate judge correctly noted, there were moments during the hearing when Lewis also revealed an understanding of the ways in which he believed his trial counsel had been ineffective and an ability, albeit limited, to impeach the attorney on those points. For example, Lewis made some good points when he cross-examined his trial counsel on the latter's testimony that he had repeatedly visited Lewis in the county jail and impeached counsel with the latter's responses to grievances that Lewis had earlier filed against him, in which responses the attorney never mentioned these visits. (State Habeas Hr'g Tr. at 41-44; *see also* cross-examination at 53-56.) In his own testimony, and in a reasonably coherent manner, Lewis

contradicted his attorney's testimony that the two had frequently consulted prior to trial, as well as other statements the attorney had made. (*Id.* at 63-66.)

While Lewis was unable to develop the record adequately or cross-examine his trial counsel effectively enough to prevail in his state habeas petition and while signs of his mental illness were certainly in evidence at various points during the hearing, Lewis nonetheless showed an awareness of the relevant issues and a responsiveness to testimony with which he disagreed. As the magistrate judge noted, through cross-examination and otherwise, Lewis exhibited more than the "basic skills of daily living" by addressing his primary state habeas argument—-ineffective assistance of counsel. He accomplished this by attacking the veracity of his trial counsel's statements that (1) they communicated regularly, (2) they discussed trial strategy, (3) that Lewis agreed to waive his right to testify or challenge the state's DNA evidence, (4) that Lewis had consensual sex with the victim, and (5) that they discussed the fact that he faced the possibility of life without parole if convicted. (3d R&R [59] at 27.) He also attacked his trial counsel for failing to raise his mental illness as a defense.

(*Id.* at 27-28.)  Lewis also appeared to understand the contents of the report of the state's medical witness and the nature of the sentencing error in his case.[28]  (*Id.* at 28.)  He also accused his trial counsel of misleading him about his sentence. (*Id.*)

In short, Lewis's initiation and participation in the state habeas process is indicative of some level of capacity. He certainly did not reveal himself to be someone who would not have understood the need to pursue his habeas litigation in a timely fashion, which is the focus of the present litigation.

As to the fact that Lewis had to rely on other inmates to help him draft his pleadings, the Court is persuaded that this is the case.  Nevertheless, the need to rely on other prisoners is not sufficient to obtain equitable tolling.  See *Pogue v. Crosby*, No. 8:02CV2174T27EAJ, 2006 WL 213866, at *3 (M.D. Fla. Jan. 27, 2006)(petitioner's *pro se* status does not warrant equitable tolling)(citing *Smith v. McGinnis*, 208 F.3d 13, 17-18

_____

[28]  Lewis's initial oral sentence was modified, after a written motion by the state, to impose life sentence for his rape and sodomy convictions.  A clerical error, mistakenly identifying the wrong statute as the basis for the life sentence, led the state habeas court to remand the case to the trial court for correction on this sole point.

(2d Cir. 2000)); *Turner v. Johnson*, 177 F.3d 390, 392 (5th Cir. 1999)(lack of representation during the applicable filing period does not merit equitable tolling)); *Albarado-Santana v. United States*, No. 8:06-CV-1442-T-27TBM, 2008 WL 254150, at *4 (M.D. Fla. Jan. 29, 2008)(to the extent the petitioner "relied on a fellow inmate's assistance, that individual's neglect in delaying preparation of Petitioner's motion will not toll the limitation period"); *Wilson v. Giles*, No. 3:04-cv-1157-WKW, 2007 WL 1266366, at *5 (M.D. Ala. Apr. 30, 2007)(petitioner's reliance on the assistance and erroneous advice of an inmate law clerk fails to establish extraordinary circumstances necessary to excuse an untimely filing)(citing *Whiddon v. Dugger*, 894 F.2d 1266, 1267 (11th Cir. 1990)); *Werley v. Crosby*, No. 4:04-cv-00518-MP-EMT, 2007 WL 1191913 (N.D. Fla. Apr. 19, 2007)(petitioner having to rely on inmate legal assistants was not an "extraordinary circumstance"')(citing *Helton v. Sec'y for Dep't of Corr.*, 259 F.3d 1310, 1312 (11th Cir. 2001)).

At bottom, Lewis has not explained why he happened to file his petition on the date it was filed, as opposed to an earlier, compliant date. In his testimony at the evidentiary hearing, he indicated that a Ricky Sweet helped him to draft his federal

habeas petition, (Evid. Hr'g Tr. at 137), but there was no affidavit from Sweet or testimony from Lewis explaining the timing of the filing. Again, that omission is fatal to the party with the burden of proving causation.

From a review of the timing of the filing of the federal petition, which was almost a year after the denial of the state habeas petition, the Court suspects that Lewis, or Ricky Sweet, assumed that Lewis had an entire year to file his federal petition and still be in compliance with AEDPA. Either Sweet or Lewis ignored the 79 days that had passed between the date the conviction became final and the filing of the state habeas petition, or they did not understand its significance. But if this is what happened, it was a mistake of law, not a manifestation of mental illness, and a mistake of law by petitioner or those inmates helping him is not a basis for equitable tolling. *Jackson v. Astrue*, 506 F.3d 1349, 1356 (11th Cir. 2007)("ignorance of the law does not, on its own, satisfy the constricted 'extraordinary circumstances' test").

## E. CONCLUSION

Statutes of limitations are typically harsh, inflexible, and unforgiving. To ensure that habeas petitions are timely

filed, Congress has imposed a statute of limitations.  Moreover, the escape valve for the AEDPA statute of limitations, equitable tolling, likewise imposes a very high standard before this benefit can be conferred.  While the Court is sympathetic to petitioner and to his plight, it must conclude that the magistrate judge correctly recommended that Lewis's mental illness, although severe, is not an "extraordinary circumstance" preventing Lewis from timely filing his federal petition.

## V.  **ACTUAL INNOCENCE**

The Court held in abeyance Lewis's objection to the Second Report and Recommendation [36] that rejected petitioner's argument that time should be equitably tolled based on his actual innocence.  The Court addresses this objection now.

Lewis objects that he is actually innocent of rape and aggravated sodomy.  (Order of Apr. 5, 2010 [42] at 17.)  Under *Schlup v. Delo*, 513 U.S. 298 (1995) and *House v. Bell*, 547 U.S. 518 (2006), a threshold showing of innocence justifies a review of the underlying constitutional claims.  The actual innocence claim under *Schlup* is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on

the merits." *Schlup*, 513 U.S. at 315. To meet the threshold showing, a claim of actual innocence "requires [a] petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Id.* at 324. The petitioner "must demonstrate that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," and "must raise sufficient doubt about [his] guilt to under confidence in the result of the trial." *Johnson*, 513 F.3d at 1334. "[A]ctual innocence" means "factual innocence, not mere legal insufficiency." *Id.* This standard is demanding and permits review only in the "extraordinary" case. *House*, 547 U.S. at 538. Thus, "[i]n the usual case the presumed guilt of a prisoner convicted in state court counsels against federal review of [untimely] claims." *Id.* at 537.

Lewis has produced no new reliable evidence that was not presented at his trial but that, had it been, would have made it more likely than not that the jury would have acquitted him. This alone is a sufficient basis to reject Lewis's actual

innocence claim. *Rich v. Dep't of Corr.*, 317 Fed. App'x 881, 883 (11th Cir. 2008)(rejecting actual innocence claim because petitioner presented no new evidence); *Sibley v. Culliver*, 377 F.3d 1196, 1206 (11th Cir. 2004)(failure to present evidence provides no basis upon which court can second-guess jury's verdict).

Scouring the record for any potential basis to conclude Lewis was actually innocent, the Court can only speculate that Lewis might critique the credibility of the witnesses or the scientific evidence presented at trial. (1st Am. Pet. [25] at ¶ 158; State Habeas Hr'g Tr. [7-2] at 65.) Yet, an argument that the victim was less than credible is not evidence of factual innocence. *See Calderon v. Thompson*, 523 U.S. 538, 562-63 (1998)(rejecting evidence which impeached the credibility of jailhouse informants who testified that petitioner confessed the rape and murder to them). Systematic inaccuracies in DNA testing at the Georgia Bureau of Investigation, even if true, would also not likely overcome Lewis's heavy burden. *Scarlett v. Sec'y, Dep't of Corr.*, 404 Fed. App'x 394, 402 (11th Cir. 2010)(rejecting actual innocence claim where DNA evidence on robbery ski mask did not exclude petitioner as DNA donor, and

new DNA evidence was neither exculpatory nor inconsistent with other evidence suggesting petitioner wore the ski mask during the robbery).  Lewis's allegations of prosecutorial misconduct also cannot form the basis of an actual innocence claim.  *See Cannon v. Johnson*, 23 Fed. App'x 218 (6th Cir. 2001)(habeas petitioner's allegation of prosecutorial misconduct related to fairness of trial, not actual innocence, and thus could not be basis for tolling of statute of limitations).

Even if some new evidence was available, the Court has doubts that Lewis could meet his burden to show that it is more likely than not that "no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  A brief review of the record demonstrates this conclusion.

On March 17, 2002, fifty-nine year old Carol Calfee opened up her front door to allow some fresh air to enter her apartment around 5:30 or 6:00 AM.  (State Habeas Hr'g Tr. [7] at 10.) After going to the bathroom, she returned to find a man standing in her doorway.  Calfee, who is nearsighted, mistook the man in her home for her neighbor's grandson and invited him inside. (*Id*. at 11.)  The man began to fondle her breasts, which caused her to shove his hands away and tell him to leave.  (*Id.* at 11-

13.)  He got up from the couch where they had been sitting as if to leave, and, as Calfee moved to shut the door behind him, the man shut the door himself.  (*Id.* at 13.)  Calfee tried to run past the man to the door, screaming for help, but he jerked her hair backwards and began to choke her.  (*Id.* at 13.)  He threatened to kill her if she screamed.  (*Id.*)

He then removed her underwear and shorts, and began to rape her.  (*Id.* at 14.)  Using his saliva as lubrication, he alternated between raping and sodomizing Calfee for two hours.  (*Id.* at 15-16, 20-21, 28.)  In addition to slamming her body onto the couch and floor, he would choke her just short of passing completely out.  (*Id.* at 14-16.)

After the violation was over, the man told her that she could put her clothes back on and requested a drink.  (*Id.* at 28-29.)  Calfee brought him a beer from the refrigerator and he took a sip of it.  (*Id.* at 29.)  The man then said he would leave after he found his glasses, which he found by searching through a quilt.  (*Id.* at 29-30.)  He then took some B.C. and Mr. Goody powders off of the coffee table, and threw Calfee's phone behind the couch after unplugging it.  (*Id.* at 30, 45.)  Calfee went to a neighbors to call the police.  (*Id.* at 31.)

From there, she was taken to the hospital for examination. (*Id.* at 32.)

Officers observed Lewis walking down the road shortly after Calfee reported the attack. (*Id.* at 55-56.) He matched the physical description of her attacker, and when police attempted to question him, he ran away. (*Id.* at 55-56, 68.) The officers apprehended Lewis and, in searching his person, found some headache powders, some change, and a cell phone. (*Id.* at 55-56.) He also appeared intoxicated, but refused to take a field sobriety test. (*Id.* at 70-71.) When they attempted to place Lewis into the patrol car, he kicked two of the officers. (*Id.* at 57, 72-73, 88-91.)

Calfee's encounter left her with bruises on her arms, neck, the inside of her legs, and also left her with a scrape on her back. (*Id.* at 25-28.) An investigator took photos a few days after the incident that revealed much more extensive bruising, but these photos were lost. (*Id.* at 95-97.) A medical examination did not reveal any tearing of the vaginal wall, and the rape kit tested negative for semen. (*Id.* at 160-61, 163.) While Calfee also suffered from severe hemorrhoids, the doctor was unable to determine if these preexisted the sodomy. (*Id.*

at 153.)  The treating physician testified that her bruises were consistent with her alleged attack and that the absence of injuries to the vagina or rectum was not unusual in his experience, particularly where lubrication, like saliva, might decrease the appearance of trauma.  (*Id.* at 154.)

The officers recovered a beer can from Calfee's residence whose DNA matched positive for Lewis and an unknown person. (State's Tr. Ex. 25 [7-12] at 1-4.)  Although unable to identify Lewis at trial, she did point Lewis out as the attacker in a photo array a couple of days after the incident.  (State Habeas Hr'g Tr. [7] at 101.)

Based on the above evidence, the jury found Lewis guilty of rape, aggravated sodomy, aggravated assault, criminal trespass, two counts of misdemeanor obstruction of a law enforcement officer (as one count of felony obstruction of a law enforcement officer having been reduced by the jury), one count of felony obstruction of a law enforcement officer and possession of marijuana (less than an ounce).  (*Id.* at 204-205.)  Lewis was acquitted of the pedestrian under the influence charge.  (*Id.* at 205.)

The DNA evidence demonstrating Lewis's presence in the

victim's home, his similar appearance to the attacker's description, his possession of objects taken from her residence, the extent of her injuries, and medical testimony provide direct and circumstantial evidence from which a reasonable juror could find Lewis guilty beyond a reasonable doubt. In sum, this is not an "extraordinary case" that warrants lifting the time-bar to Lewis's untimely claim. Petitioner's objections on this point are therefore likewise overruled.

## VI. <u>CERTIFICATE OF APPEALABILITY</u>

The magistrate judge recommended that Lewis be granted a certificate of appealability on the sole issue of whether Lewis's mental problems warrant equitable tolling. (2d R&R [36] at 43-44.) A COA may issue only when the petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For a COA to issue on a procedural issue, jurists of reason must find it debatable both "whether the petition states a valid claim of the denial of a constitutional right" and "whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

The Court intends to issue a COA for petitioner Lewis, but

directs his counsel to present to the Court the issues on which he seeks this certificate.

## CONCLUSION

For the above reasons, and except as otherwise changed or supplemented, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation [36] and [59], over Petitioner's Objections [60]. The Court therefore **GRANTS** Respondent's Motion to dismiss the petition as untimely [32], and Petitioner's habeas petition is **DISMISSED**. The Clerk is **DIRECTED** to close this case. Petitioner shall file a a Certificate of Appealability setting out the issues he wishes to pursue on appeal.

To avoid unnecessary confusion for the appellate court reviewing this Order, and to avoid the need for that court or defense counsel to have to scour both the R&R and this Order to determine the basis of this ruling, the Court indicates that, except where the Court expressly adopts or refers with approval to a portion of the R&R, this Order should be considered to be the document that provides the basis for this Court's reasoning,

both in terms of conclusions of law and findings of facts.[29]

SO ORDERED, this <u>30th</u> day of September, 2012.


<u>/s/ Julie E. Carnes</u>
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

---

[29] The magistrate judge did offer a fuller explanation than did this Order of the ruling on the statutory tolling issues related to the operative filing date for the state habeas petition and to the reasons why the magistrate judge and this Court concluded that the entire time that the appeal of the state habeas denial was pending before the Georgia Supreme Court should be statutorily tolled. Thus, should the State appeal this Court's determination that the above time should be tolled, the magistrate judge's discussion, as supplemented in this Court's Order, reflects the undersigned's reasoning on these issues.